## Western Union Telegraph Company v. E. W. Burton.

Decided December 3, 1908; January 21, 1909.

**Master and Servant—Known Danger—Electricity—Live Wire.**

Evidence considered, in case of a telegraph lineman burned by a live wire which was dangerously charged by contact with a trolley wire, and held to show knowledge of the danger by the injured employe, though he denied such knowledge, precluding his recovery and warranting the reversal and rendition in favor of defendant of a judgment for damages recovered by him against his employer.

Appeal from the District Court of Bowie County.   Tried below before Hon. P. A. Turner.

*Young & Stinchcomb* (*George H. Fearons,* of counsel) for appellant.—The appellee knew that the wire that he was about to handle was charged with electricity, or in the ordinary discharge of his duties as a lineman he came into possession of such information as would necessarily cause a man of ordinary understanding to know that it was so charged, therefore he assumed the risk of such danger as might arise from the handling of the wire.   Railway v. Peden, 32 Texas Civ. App., 315; Railway v. Somers, 71 Texas, 700; Quill v. Railway, 93 Texas, 616.

*Smelser & Vaughan,* for appellee.—It was a question for the jury whether appellee knew that the wire was charged with electricity, or in the discharge of his duties as a lineman came into possession of such information as would cause a man of ordinary care to know that the said wire was charged; and, therefore, it was a question for the jury whether appellee assumed the risk.   Questions of facts are for the jury.   Constitution, art. 1, sec. 15; Sayles' Texas Civ. Stats., art. 1317; Choate v. Railway, 91 Texas, 406; Choate v. Railway, 90 Texas, 82-88; Wallace v. Southern Cotton Oil Co., 91 Texas, 18; Texas & P. Ry. Co. v. Murphy, 46 Texas, 366; Boyd v. St. L. S. W. Ry., 108 S. W., 813.

Appellee did not assume the risk of injury caused by the wire coming in contact with trolley wire through the negligence of appellant; nor did he assume the risk of injury caused by the negligence of appellant in failing to use ordinary care to inspect its wire and discover the contact with the trolley wire; but on the contrary he had the right to assume and to act upon the assumption that the appellant, his master, had done its duty and had been guilty of no negligence, and that said wire was not dangerous and that he could safely perform the work appellant had ordered him to do.   Southern Pac. Co. v. Winton, 27 Texas Civ. App., 503; Railway v. George, 85 Texas, 156; Railway v. O'Fiel, 78 Texas, 488; Railway v. Somers, 71 Texas, 702; 4 Thompson on Neg., secs. 3758, 3759, 3764, 3765, 3781, 3789, 3791.

There was sufficient evidence for the court to submit to the jury the question of fact whether or not the appellant was guilty of negligence as alleged.   Same authorities; also, McCrary v. Railway, 89 Texas, 168; Washington v. Railway, 90 Texas, 314.

HODGES, ASSOCIATE JUSTICE.—The appellee, E. W. Burton, filed this suit against the Western Union Telegraph Company for the sum of $2,000 damages, alleging, in substance, that on the 23d day of June, 1905, he was in the employ of the appellant as a lineman at Texarkana, and that in attempting to clear a charged wire he was burned and suffered physical and mental injuries to the amount sued for.   He alleges that the wire was charged with a heavy voltage of electricity as the result of the negligence of the appellant in permitting it to become detached from its fastenings and to fall on a trolly-wire of the street-car company which extended under it.   The appellant

answered by a general denial, and specially pleaded that the plaintiff's injuries, if any, were the direct and proximate result of risks he assumed, his own contributory negligence, independent acts of third party, the negligence of the fellow servant, and settlement. The case was tried before a jury, resulting in a verdict and judgment in favor of the appellee for $500 and costs. From that judgment the appellant has appealed to this court.

The petition, when given its full legal import, avers that the wire was charged with a dangerous current of electricity through the negligence of the appellant in permitting it to sag and come in contact with a trolley-wire; that the appellant knowing this, or by the exercise of ordinary care could have ascertained it, negligently failed to notify appellee of that fact; that by the appellant's failure to inspect its line it led the appellee to believe the wire contained no current. The petition does not allege that the appellee was ignorant of the dangerous condition of the wire, nor does it state that there was anything in the appearance of the wire at the time he undertook to repair it that misled him as to its condition.

*Findings of Fact.*—The testimony in this case is exceedingly voluminous, covering more than fifty typewritten pages. That portion devoted to the examination of the appellant himself consumes the greater part of this space. The facts, condensed as briefly as we can, show the following: That Burton, the appellee, was an experienced lineman, well acquainted with all of the dangers of electricity and skilled in the work of constructing and repairing lines and of handling wires of all kinds used by the appellant company in its business, as well as electric light wires. He had been in the business as a lineman for a number of years, and had been employed in the service of the appellant at Texarkana since 1902, and was familiar with the lines and wires traversing that city. His duties are shown to be to do general repair work for appellant in Texarkana, within the city limits, not beyond, and in some other cities along the lines of railroads leading out of that place.

Burton testified that on the date the injury occurred, about 10:30 o'clock in the morning, he walked into the office of the appellant in Texarkana and took from the hook the following order written on one of the Western Union forms: "To E. W. B.: Nash reports T. P. wire down at Oak Street section house; please fix. 10:10 A." E. W. B. referred to meant the appellee, E. W. Burton, and the letter "A" meant a. m. The order was supposed to have been given by Mr. Church, appellant's wire chief at Texarkana, and who had the authority to issue it. Nash, mentioned in the order, was the train dispatcher of the Texas & Pacific Railway Company. After taking the order from the hook Burton started out to do the work as directed, and as he walked out of the appellant's office he saw Nash and Gribble, the appellant's local manager in Texarkana, standing near the entrance on the street talking. He did not hear, it appears, what they were talking about, or what Nash said to Gribble about the wire. He thus gives his version of what he heard Gribble say: "I came out of the office with this order in my pocket and a pair of climbers in my hand.

I did not hear what Nash said to Gribble. Gribble told me that there was a live wire, or an electric wire, down across the Oak Street crossing, and told me to be careful if I went down there not to get hurt with it, and I told him we had no wires across Oak Street—that it must be the arc circuit that was down, and I would not handle the arc circuit because it was none of my business." In another place he says: "Mr. Gribble says Nash reported a live wire or an electric light wire down across Oak Street, and told me to be very careful if I fixed it up." The appellee also stated, however, that this conversation did not relate to the wire he was ordered to fix—or at least that was his construction of it. He went first to Oak Street crossing, and found nothing wrong there except that the arc circuit swung a little low. He then returned and traced the wire from the office to where it entered the cable-box at the Cosmopolitan Hotel, and then followed it on down to where it was broken. This was within 150 yards, or a little more, of the Oak Street crossing. There he found that the wire, right where it crossed the T. & P. and Cotton Belt Railroad track, had broken, and the ends were hanging down from the poles on each side of the track. He climbed the pole on the north side and clipped the end of the wire that was hanging down. That was on the side next to where the appellant's office was situated. But before undertaking to manipulate the wire on the other side he made an examination of the situation. He followed the wire out along the line of the Texarkana & Fort Smith Railroad Company for about six blocks, as he states, for the purpose of ascertaining whether or not it was in contact with the electric-light wires or the trolley wire of the street-car company. He found no contact, and says that he did not know of any other places where there could be a contact within the city limits. After returning to the wire he still would not undertake to handle it while standing upon the ground, because, as he says, he was afraid to do so. If the ground upon which the wire was lying was dry there would be no indications to show that the wire contained a current; but if the end were put upon grass or wet earth it would show evidences of the presence of electricity. He states specifically as the reason why he did not handle the wire immediately upon his return was because he was afraid of it. However, he says that he did not know at the time what was on the wire, and that was the reason why he was afraid of it after he had returned from his tour of inspection. He knew that this wire ran no farther than Ashdown, a distance of twenty miles up the Texarkana & Fort Smith Railway line, and that there were no electric plants along the line from which it could become charged. He says that he did not at that time know that the trolley wire on the street-car line crossed under this line out at the park, three miles from the city. The last time he was out there was something like a year before the accident, and at that time the line did not extend across the track of the Texarkana & Fort Smith Railway Company, and there was no possibility of a contact. He says that he made his investigations for the purpose of protecting himself against injury. The wire he was called upon to repair was designated as "No. 21," and was what was called a "dead wire," one which was not in use at that time. All that he was required to do was to cut

the wire off of the poles and get it out of the way. As to what he did after having inspected it to ascertain whether there was any contact with a live wire, he says: "I climbed up the pole about twelve feet, I suppose, from the ground, as all linemen do. I went to tip the wire—another precaution. I reached out then with the end of my finger, and when I touched it it shocked me. As to how I come to touch it and not grab it, that is another precaution that linemen most always take—reach your fingers out and tip the wire. If you notice a lineman at work, they will reach out and tip the wire with their fingers, but not grab it. When I touched it it shut my hand around it and knocked me off the pole. I fell to the ground, the wire still in my hand." The witness then described his effort to extricate himself, and the extent of his injuries sustained. After having his wounds dressed Burton procured the assistance of one of the employes of the light plant, and together they repaired the broken wire by first grounding it; that is, putting the end in contact with a piece of metal called a "nigger head" in the ground near the pole. After having done this the wire was clipped without any unpleasant consequences. They moved the wire to the grounding connection with a stick. Burton testified that he learned afterward that the wire was charged by being permitted to come in contact with the trolley wire of the street-car company where it crossed under the Western Union lines at the park, three miles from the city. It appears that the brackets upon which the wire had been strung had been broken loose, and the wire sagged and lay across the trolley wire. There is no evidence as to how long this condition had been in existence, nor what was the cause of the brackets being broken loose. Appellee testified, on cross-examination, that when he and Pope, the lineman called to assist him, arrived at the place where the wire was broken and where he was injured, the wire was sparkling and was burning the grass. He admits that there might have been some water near by which he could have tested the wire and ascertained the presence of electricity. There had been a rain the night before and the ground was damp. If he had known that the wire was hot—that is, charged—he would have procured implements with which to handle it in safety, such as rubber gloves or rubber boots. With rubber gloves the wire could have been handled with safety. The company kept rubber gloves for that purpose in the office. He detailed a variety of tests that might have been made to ascertain the presence of electricity, and many ways in which the wire could have been handled with perfect safety even though charged. As to why he tipped the wire after climbing the pole, he said that was a precaution they always took and was always done by linemen; that he was uncertain, and did it to keep from getting burned. A current from an ordinary telegraph wire will not burn, but will only shock a little. There was no danger in clipping the wire under such circumstances, with an ordinary telegraph current. He did not have any suspicion that the wire was charged; had he had any he would have adopted a different method. The testimony further shows that climbing the pole and using the pole as an insulater rendered it ordinarily safe for one while clipping a charged wire. It is also shown in this case that, had the pole been dry upon which he had climbed, he would

have experienced no difficulty from the current in the wire; but on account of it being wet from the rain the night before, it furnished a conduit for the current, and appellee received the full force of the charge when he "tipped" the wire.

Tom Burke, the roadmaster of the Texas & Pacific Railway Company, appears to have been the first witness who discovered that the wire was down in the yards of that company, and he it was who reported it to Nash, the train dispatcher. Burke testified that at the time he saw the wire on the ground it was emitting sparks and showed to be dangerous. Nash, after receiving the information from Burke, went to the Western Union office and reported the trouble to Gribble, the manager, a short time before Burton appeared. Gribble told Burton what had been reported, and that it was an electric wire, or live wire—witness did not remember which—hanging down in the yards near the Cotton Belt crossing, and that one of the men had been shocked by it. Gribble testified that he talked to Burton just after the latter came out of the office with the order, and warned him to be careful about handling the wire. Gribble also stated that he could not remember the exact language he used, but he was sure that he warned him to be careful, that the wire was hot. He further says that it was his intention to caution Burton against that trouble; that it was the only case of trouble that morning; that Burton had charge of all of the company's lines in the city. That when Burton returned from his attempts to fix the wire he showed his burns but did not say anything about not knowing that the wire was alive, nor did he say anything about having investigated to ascertain whether or not there were any wires in contact with the Western Union wire, but went with him to the office of the electric light company, when he, Gribble, made complaint that some of that company's wires were causing the trouble. Nash testified that he heard Gribble tell Burton that he (Nash) had informed Gribble that there was a live, or an electric wire—he did not remember the language used, whether it was a live wire or an electric wire—that was hanging down in the yards near the Cotton Belt crossing, and that one of the men had been knocked down by it down there. He heard Gribble tell Burton that, and those were about the words used. That he himself did not know where the wire was down. That Gribble gave Burton the substance of the report that he, Nash, had made to Gribble.

Ross Green testified for the appellee about the contact of the Western Union wire at the park, that he was an expert of several years experience, and said that the trolley wire was charged with the current of about 525 volts; that the proper way to cut off a Western Union wire would be to get something to stand on—climbing the pole would be safe. Whether this would be safe in handling a live wire would depend on the weather; with a voltage of 550 dry wood would do for insulation, and would be safe.

McCann, a witness for the appellant, testified that he was in the service of the appellant company; that he had a conversation with Burton about his injuries after they occurred, in which Burton told him that he went down to clear the wire, climbed the pole for the purpose of cutting the wire loose, put his hand on the wire and was

knocked off the pole; that he thought the wire was hot and went up the pole for protection, but that the pole must have been damp.

In rebuttal, Burton admitted having a conversation with McCann about the accident, but said he did not tell McCann that he thought the wire was hot, and that was why he went up the pole. He said: "I told him that a man had just been hurt, and that I had helped to take him up and helped to carry him to the hospital, and I thought in case the wire was hot, I thought I would go up the pole and that I would be out of danger. I did tell him I thought the wire was hot."

Burton further testified that after he had his talk with Gribble (previously referred to) he went "straight down to this wire 21. Went to Oak Street first to see if any wire was down there. He did not see any trouble there. The Western Union had no wires on Oak Street." It is proper to say in this connection that Burton denied that he knew the wire was charged, or that he had any suspicion of that fact till after he was burned. He further testified that when Gribble spoke to him about being careful in handling the wire he did not know he was referring to the wire he was to fix and which had been reported by Nash. With the exception of that portion of McCann's testimony which is denied by Burton, all of the evidence we have given is undisputed.

*Conclusion of Law.*—In the first assigned error appellant complains of the refusal of the court to instruct the jury to return a verdict in its favor. Other assignments in different forms question the sufficiency of the evidence to sustain the judgment of the court. The principal question presented by the facts is, does it appear from the evidence that the appellee, Burton, assumed the risk of the danger incident to handling the wire in the manner he did, notwithstanding its charged condition may have been the result of the master's negligence? The jury has said that he did not. Shall we say that this finding is unsupported by the evidence, or so opposed to the great weight of the evidence that it should not be permitted to stand?

The principles of law applicable to the state of facts here involved are well-settled and need no discussion. The servant assumes the risk of all dangers ordinarily incident to his employment. He also assumes the risk of those dangers resulting from the negligence of the master the existence of which he knows, or would have learned by the exercise of that degree of circumspection, or attention, which a prudent man would have used in the particular employment. St. Louis & S. W. Ry. Co. v. Hynson, 101 Texas, 543; 1 Labat on Master and Servant, secs. 257, 270, 271. If Burton knew the wire was charged with an unusual electric current, or if the warning which he undeniably received from Gribble, the manager, was sufficient to put an ordinarily prudent person in the same employment upon notice that it might be, then this judgment should be reversed upon the ground that the risk was assumed.

It is true that the appellee, in testifying in his own behalf, stated more than once that he did not know the wire was so charged; that he had no suspicion of such a condition or he would have taken some precaution to guard against the danger. Courts can not probe a man's

mind and tell what he knows, feels or thinks about a particular matter; but it does not follow that they are bound, in all cases, to accept what he says he knows, feels or thinks, as conclusive upon such issues, or as outweighing other evidence, though circumstantial in its nature, the potency of which may be due to the absence of interest or bias. The conduct of the witness at a time when he had no motive for concealment, and the hostile facts which he afterwards admits to be true, when possessing sufficient probative force and pertinency, are far safer guides of what may have been in his mind at the critical moment. But it may be true that Burton did not know positively that this particular wire was charged, or at the time he attempted to test it he had no well-founded suspicion of that fact; still this ignorance would not protect him against the assumption of the risk, if the warning and information which had previously been communicated to him were sufficient to create a reasonable apprehension of danger in the mind of a person of "ordinary circumspection in the particular employment." The order which he took from the hook informed him that a wire was down near the Texas & Pacific section house, and that this fact had been reported to the office by Nash, the T. & P. train dispatcher. The order had not been filed more than twenty minutes before the appellee took it from the hook and started out on his errand to repair the wire. As he walked out of the office to the sidewalk he found Nash, the very man who had reported the trouble, in conversation with Gribble, the manager. According to his own admission, Gribble told him that Nash had reported a wire down at Oak Street crossing, and warned him to be careful in handling it. He said that Gribble told him that it was either an electric wire or a live wire, he did not remember which. He knew his company had no wires at the Oak Street crossing, so he says, but he went there to examine the conditions and found no wire down. It must have appeared to him then that there had been a mistake by Gribble in the location of the trouble. If he at first concluded that the wire Gribble referred to was not the one mentioned in the order, subsequent events should undoubtedly have removed that impression. The wire he was to fix, and the one he was warned to use caution in handling, was the one which *"Nash had reported down."* After finding no trouble at Oak Street crossing, he then traced the line, as he says to a point about 150 yards west of the Oak Street crossing to the place designated in the order as the location of the trouble. Assuming that Gribble told him that the trouble was at Oak Street crossing, which is denied by other witnesses, upon finding no wire down at Oak Street but finding one down so near it, it must at once have appeared to any reasonable person that this was the trouble referred to by Gribble and the danger against which he was warned. Gribble says they had but one case of trouble that day—the one Nash had reported—and this was the one he was warning Burton about. It is difficult to conceive how any reasonable person, having Burton's acquaintance with the situation of the wires in that locality, and under the circumstances attending the conversation with Gribble in the presence of Nash, could have been misled into believing that there were two cases of trouble instead of

Vol. LIII Civil—25.

one, or that Gribble was referring to a trouble different from that mentioned in the order then in appellee's hands. Burton's conduct after arriving at the place where the wire was broken is strangely at variance with what one would do who was ignorant and unsuspecting of the dangerous condition of the wire, and is strikingly similar to what one who had received a warning would do under such circumstances. Before he would handle the wire, even for the purpose of testing it, he first traveled six blocks to ascertain whether or not there was any contact with either a trolley wire or an electric light wire. He knew, he says, that there was no batteries between Texarkana and Ashdown, the other terminus of the wire he was to repair, and deemed it unnecessary, for that reason, to pursue his investigations further than the last point where any of the charged wires in the city crossed the Western Union wire. Even after returning, according to his own admission, he deemed it dangerous to handle the wire while standing upon the ground, but as a precaution climbed a part of the way up the pole, and while thus using the pole as a means of insulation he tipped the wire with his finger to ascertain whether or not it was charged. It must be borne in mind that the injuries which he received occurred, not while he was handling the wire for the purpose of clipping it, nor by reason of having apparently taken hold of it without any suspicion of its dangerous condition, but while testing it according to a method he had adopted for his own convenience, to ascertain whether or not it was charged. We think that every move he made is entirely consistent with the theory that he had been warned as to the condition of the wire, and that he had serious apprehensions of danger in handling it, if it does not conclusively show that he knew of its actual condition. The more reasonable inference to be drawn from the conduct of the appellee is that he was apprehensive of danger from handling the wire without insulation, and overlooked the fact that the rain on the preceding night had destroyed the nonconducting properties of the pole, but, relying upon the usual conditions of a dry pole, he assumed that precaution of climbing it for protection against current.

The testimony of the appellee as to what he told McCann concerning his reason for climbing the pole before testing the wire amounts almost to an admission that he knew the wire was charged, or that it was likely to be so. He says: "I thought, in case this wire was hot, I thought I would go up the pole and that I would be out of danger." What danger was he undertaking to avoid? The proof shows beyond question that an ordinary Western Union wire does not carry a dangerous current unless it comes in contact with a heavy charged wire of some other description. He had made investigation to ascertain whether or not there was such a contact, and found none. Whence came his apprehension of danger, if not for the warning Gribble had given him?

There is another circumstance which points with much force to knowledge on the part of appellee. When Burke discovered the wire earlier in the day, lying on the ground, he says it was showing the presence of an electric current; and again, after the accident, when Pope, a lineman from the electric light company, went with the ap-

pellee to assist him in repairing the broken wire, it was then showing its charged condition. Why it should not have made the same manifestations when the appellee was there alone is attempted to be explained by the statement that it was then lying upon a dry place on the ground. All of the testimony upon that point shows that a slight movement of the wire till it came in contact with damp earth, or grass, would disclose its condition; and the appellee admits that this could have been done by him without trouble, by using a stick. How the wire got upon dry ground after it was observed by Burke and before the appellee reached it is not explained.

We think the evidence is sufficient to justify us in holding as a matter of law that the appellee assumed the risk of the danger he encountered in handling the wire in the manner he did. To say that he did not know or suspect that the wire was charged is not sufficient in view of the great array of facts which contradict such assertions and which show that had he given even slight attention to his warnings, or taken a small precaution in testing the wire to ascertain whether or not it was charged, he would have known of its condition. The appellee should not be permitted to shut his eyes to what he might have seen, or to close his ears to what he might have learned, or refused to heed an admitted warning, and then say he did not know the wire was charged. He was bound to use his senses, and if he failed it was at his peril.

The judgment is reversed and here rendered in favor of the appellant.

### ON MOTION FOR REHEARING.

Among the objections urged to the conclusions we reached in the original disposition of this case, is that we erred in finding as a fact that Burton, after having made his inspection to ascertain whether the broken wire was in contact with any other charged wire, and had returned to the place where the wire was broken, was still afraid to handle it. We think the following statements made by appellee in his testimony are sufficient to warrant our finding: "Perhaps the reason I climbed the pole was because I was afraid to stand on the ground and handle the wire. I don't know. As to touching the wire after I climbed the pole, that is a precaution we most always take. I did do that. I was, of course, uncertain." Again he says: "I did not prefer to touch my finger to it (meaning the wire) on the ground. I would not even risk my finger to it on the ground. As to whether I was afraid of it—afraid to put my finger against it on the ground, I did not do it." This testimony had reference to the state of his mind after he made the inspection about which he testified. It is also contended that even if it be held that the evidence is sufficient to show that Burton had been notified of the real condition of the wire, the evidence further shows that he made such an examination as would be required of a person of ordinary prudence under the circumstances, and thereby became convinced that the wire was not charged, and that for this reason he had the right to assume that the wire was harmless, or that if any danger had previously existed it had been removed. We do not think this position tenable. If information sufficient to put a

person of ordinary prudence on notice of the charged condition of the wire had been given to Burton, then the duty which the master owed him was thereby discharged and Burton assumed the risk resulting from any given course of conduct which he thereafter voluntarily adopted, either in testing or handling the wire. In those cases where the obligation rests upon the master to notify the servant of a particular danger attending the performance of his duty, if the servant ascertains for himself the existence of the danger, or is in possession of such facts as would put a person of ordinary prudence in the particular employment upon notice of the presence of the danger, it is immaterial from what source the information or notice comes. The purpose of the legal requirement is to impart notice to the servant to the end that he may not encounter an unknown danger, the risk of which under the terms of his employment he does not ordinarily assume.

Again, it is urged that we should not indulge the inference that the charged condition of the wire was apparent to Burton's observation by reason of the fact that it was emitting sparks when first discovered by Burke in the morning, and was showing the same evidences of its condition after the accident, when Cook, the lineman, went with the appellee to repair the break. Our attention is called to testimony to the effect that when a charged wire is permitted to remain in contact with moist earth it will soon dry out a place in the dirt and cease emitting sparks. In this manner counsel for appellee accounts for the fact that no sparks were being emitted at the time Burton was there alone. Accepting this as sufficient to explain the absence of any sparks at the time Burton alone was at the wire, it establishes the presence of another evidence of the electric current, the place dried out upon the ground, which might have been observable to an experienced line-man examining a wire for the presence of electricity, under circumstances which seriously aroused his suspicion. Burton does not say that he did not or could not have observed such a change made upon the ground at the point of contact. The testimony of one of appellee's witnesses is, that to a very small extent the ground will show a dry place under such circumstances.

We think the record in this case, taken as a whole, furnishes conclusive evidence—most of which is supplied by the admissions of the appellee himself—that he was not exposed to an unknown danger at the time he undertook to handle this wire. His conduct and admission can not be reconciled with his declarations to the effect that he did not know or suspect the presence of an electric current.

In his work on Master and Servant, volume 1, section 390, Mr. Labatt says: "Where the evidence is conflicting as to the material circumstances which are available for the purpose of determining whether the servant ought to have known of the risk. It is clear that such a conflict is presented where the evidence tending to establish ignorance is that of the injured servant himself, whether it merely has a direct relation to the physical conditions existing at or before the time of the accident or amounts to a general denial of his possession of the knowledge which it is sought to impute to him. But it is also clear that if the courts were always to decline to interfere with the verdict

of a jury in cases in which the servant has thus testified in his own favor, their controling functions would, for practical purposes, be confined within very narrow limits. There are, it may be supposed, very few trials in which the servant does not swear that the risk was unknown to him. Due weight is attached to this consideration; for, taking the cases as they stand, it seems permissible to say that such a denial is treated as being a merely corroborative element which furnishes an additional justification for a conclusion in itself not unwarrantable even if that element were abstracted." This language is peculiarly applicable to the case before us.

Aside from the denial of the appellee, we have failed to find a solitary circumstance—not even the usual boldness one would ordinarily exhibit where danger was not suspected—which tends to show that he was ignorant of the real condition of the wire. On the other hand, there is a strong array of undisputed and indisputable physical facts and damaging admissions which seem to us to point with unerring certainty to the contrary conclusion.

After a careful review of the facts contained in the record we find no reason to alter our former decision of this case. The motion for rehearing is therefore overruled.

*Reversed and rendered.*